IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AL JAZEERA INTERNATIONAL                :

                                     :

    v.                 :   Civil Action No. DKC 13-2769

                                     :

DOW LOHNES PLLC, et al.                 :

                                     :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this attorney malpractice case is a motion for summary judgment filed by Defendants Dow Lohnes PLLC and Leslie H. Wiesenfelder ("Defendants"). (ECF No. 91). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**I.   Background[1]**

   **A.   The Facts of the Underlying Litigation**

This attorney malpractice case stems from Defendants' representation of Plaintiff Al Jazeera International ("Plaintiff") in a contract dispute with Winmar, Inc. In 2005, Plaintiff entered into a construction contract with Winmar, Inc. to build a television studio and offices in Washington, D.C. (the "Contract"). (ECF No. 99, at 7). Janson Design Group (the

---

[1]   Unless otherwise noted, the facts outlined here are undisputed or construed in the light most favorable to Plaintiff, the nonmoving party.

"Architect") was the architect for the project. (*Id.*). The Contract established a payment process under which Winmar would submit periodic invoices ("Payment Applications") for review by the Architect as Plaintiff's agent; if the Architect was satisfied, it would certify these Payment Applications to be paid by Plaintiff. (*Id.* at 8).

Between October and December 2005, Winmar submitted four Payment Applications totaling $1,838,140, and the Architect certified all four of them. (*Id.*). Concerned that Winmar had not completed all of the work for which it was seeking payment, Plaintiff paid only one of the invoices, in the amount of $474,677. (*Id.* at 9). Winmar sent Plaintiff a notice of default on December 22, asserting that it was in breach of the Contract and directing it to cure the breach by paying the remaining certified amounts. (*Id.*). Defendants advised Plaintiff that even if Winmar had not completed the appropriate amount of work, the contract language was such that non-payment could be considered a breach by a reviewing court. (*Id.* at 9-10). Given the billing dispute, Plaintiff engaged a construction manager to review the state of the project. (ECF No. 50 ¶ 22). He concluded that Winmar had overbilled Plaintiff, and, consequently, Plaintiff made no further payments. (*Id.*).

On January 5, 2006, the Architect sent a letter to Winmar, rescinding its certification for the three unpaid invoices,

declaring that the certifications had been made in error and were withdrawn on account of "a number of discrepancies in the . . . Application documents, as well as the lack of appropriate supporting documentation." (ECF No. 99, at 10).[2]   The Architect asked Winmar for additional documents supporting the invoices, which Winmar refused to provide.   (*Id.* at 10-11).   Plaintiff then terminated the Contract for convenience.   (*Id.* at 12). Plaintiff soon after sent a letter to Winmar and the Architect pursuant to the Contract's process for resolving billing disputes. *Winmar, Inc. v. Al Jazeera Int'l*, 741 F.Supp.2d 165, 177 (D.D.C. 2010).   The letter stated that, according to Plaintiff's calculations, it had overpaid Winmar by approximately $200,000.   *Id.*

Meanwhile, apparently in response to Plaintiff's attempt to confirm the status of the single payment it had made, Plaintiff's bank, Qatar National Bank ("QNB"), erroneously transferred the $474,677 payment a second time.   *Id.* at 176. Instead of returning the money to QNB, Winmar construed this as a payment for one of the other certified Payment Applications and returned the difference between the payment and Application amount, an extra $119,380, directly to Plaintiff.   *Id.* at 177. Plaintiff evidently considered this payment to be a response to its $200,000 demand, so, at that point in March of 2006,

---

[2] The Architect later rescinded certification for the fourth Payment Application, the one that Plaintiff had already paid. (ECF No. 99, at 11).

Plaintiff believed it was owed roughly $80,000. Given the amount in dispute, Plaintiff decided that it would not make economic sense to file suit against Winmar to recover that amount. (ECF No. 99, at 27).

On July 24, 2006, QNB filed suit against Winmar in the United States District Court for the District of Columbia to recover the $474,677 duplicate payment. (*Id.* at 13). Winmar then filed a third-party complaint against Plaintiff, alleging that Plaintiff had breached the Contract by not making payments pursuant to the Architect's certifications. Plaintiff retained Defendants to represent it and filed a counterclaim against Winmar, denying any liability and asserting that Plaintiff had overpaid Winmar pursuant to the termination for convenience provisions of the Contract. In its answer, Winmar alleged that, prior to the time Plaintiff terminated the Contract for convenience, Plaintiff had materially breached the Contract and, therefore, Winmar was entitled to the full amount of every invoice certified by the Architect, more than $1.7 million. *Winmar*, 741 F.Supp.2d at 177-78.

### B. The Instant Malpractice Claims

Plaintiff now alleges that Winmar's suit raised a substantial issue regarding the accuracy of the Architect's certification, but that Defendants failed to investigate the Architect's role in the events, including whether the Architect breached its duty of care. (ECF No. 50 ¶ 29). It argues that

4

Defendants' failure to investigate the Architect left Plaintiff with no factual defense to Winmar's principal claim: *i.e.*, that the certifications were *prima facie* evidence of the amount Plaintiff owed Winmar. (*Id.* ¶ 31). Consequently, when Winmar raised the certifications at trial, Defendants offered no rebuttal, leaving Plaintiff greatly exposed. (*Id.* ¶ 34).

On September 29, 2010, Judge Gladys Kessler of the United States District Court for the District of Columbia issued a memorandum opinion and order, granting judgment in favor of Winmar and against Plaintiff. *Winmar*, 741 F.Supp.2d at 196. The court found that "Al Jazeera offered no evidence at trial showing how the Architect arrived at the decision to certify the Payment Applications. . . .  In the absence of any evidence from Al Jazeera *that the Architect neglected its duties* under the Contract in making the certification decisions, the certified Payment Applications are the most reliable evidence of the services performed by Winmar in the periods covered."  *Id.* at 182-183.  Judge Kessler gave little weight to the subsequent rescissions, which were based "in large part on [the Architect's] conclusion that Winmar is required to provide supporting documentation," a justification she found was not valid under the Contract. *Id.* at 182.  She also stated that she "has never been able to understand why neither party ever called the Architect to testify." *Id.* at 182 n.17.  Judgment was granted in favor of Winmar for a total of $1,472,625.50. *Id.* at

196.   Although Plaintiff appealed the judgment to the United States Court of Appeals for the District of Columbia Circuit, it decided to settle the dispute for $2,000,000 while that appeal was pending rather than run the risk of an unfavorable outcome on appeal.[3]

On September 19, 2013, Plaintiff filed a complaint in this court for legal malpractice, citing diversity jurisdiction. (ECF No. 1).[4]   Plaintiff alleges that Defendants, as its attorneys during the Winmar litigation, owed it a duty of care to conduct a thorough and competent investigation of the facts and circumstances surrounding Plaintiff's dispute with Winmar and to exercise sound and reasonable judgment in planning and executing a defense to Winmar's claims against Plaintiff. According to Plaintiff, Defendants breached this duty by failing to depose the Architect or calling the Architect as a witness at trial.   Plaintiff contends that but for Defendants' failure to depose or call the Architect as a witness, Plaintiff would have prevailed in the Winmar litigation.   In the alternative, Plaintiff maintains that Defendants breached the duty of care by

---

[3]   Beyond the $1.4 million judgment, Plaintiff was also separately assessed attorneys' fees; post-judgment interest was also accruing while the appeal was pending.   Plaintiff represents that it was facing a final judgment of more than $3,000,000 if the appeal was unsuccessful.

[4]   Plaintiff is a corporation organized under the laws of Qatar with its principal place of business in Qatar.   Defendants are residents of the District of Columbia and Maryland.   The amount in controversy exceeds $75,000.

failing to advise Plaintiff to file suit against the Architect or to join the Architect as a defendant in the Winmar litigation.

After the court denied Defendants' motion to dismiss (ECF No. 15), the parties engaged in discovery. Defendants submitted the instant motion for summary judgment on April 16, 2016. (ECF No. 91). Plaintiff responded (ECF No. 99), and Defendants replied (ECF No. 102).

## II. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 249. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute

of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23.   Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial. *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

## III. Analysis

To succeed on a legal malpractice claim under District of Columbia law, a plaintiff must show that: (1) the defendant was employed as the plaintiff's attorney; (2) the defendant breached a reasonable duty; and (3) that breach resulted in, and was the proximate cause of, the plaintiff's loss or damages. *Martin v. Ross*, 6 A.3d 860, 862 (D.C. 2010) (citing *Niosi v. Aiello*, 69

A.2d 57, 60 (D.C. 1949)).[5]  "Unless a party has a good cause of action against the party proposed to be sued, the first party loses nothing by the conduct of his attorney even though the latter were guilty of gross negligence." *Niosi*, 69, A.2d at 60. "[I]f, notwithstanding the negligence, the client had no cause of action or meritorious defense as the case may be; or [] if conduct of an attorney with respect to litigation results in no damage to his client[,] the attorney is not liable." *Id.*

### A.   Defendants' Failure to Depose or Call the Architect as a Witness

Defendants begin by arguing that they are entitled to summary judgment under Plaintiff's theory of liability based on their failure to interview, depose, or call the Architect as a witness because evidence shows that the alleged failure was not the proximate cause of Plaintiff's injuries.  In an attorney malpractice case, the plaintiff must show that the outcome of the underlying suit would have been more favorable absent the alleged negligence by the attorney.  *Hickey v. Scott*, 796 F.Supp.2d 1, 4 (D.D.C. 2011).  "[I]n most cases, the existence of proximate cause is a question of fact for the jury, and only if it is absolutely clear that the defendant's negligence could not have been a proximate cause of the harm asserted by the plaintiff is it a question of law." *Smith v. Hope Village, Inc.*, 481 F.Supp.2d 172, 185 (D.D.C. 2007); *see also Hickey*, 796

---

[5] As discussed in the court's previous memorandum opinion on Defendants' motion to dismiss, substantive District of Columbia law applies to the claims in this case.  (ECF No. 15, at 7 n.4).

F.Supp.2d at 4 ("Causation is normally a question of fact reserved for the jury.").

Having now taken the deposition of Mr. Tsai, the representative of the Architect who certified the payments on the Winmar project, Defendants contend that his testimony would merely have supported Judge Kessler's finding that the certified Payment Applications were the most reliable and best evidence of the amount of work that Winmar had performed at the time. (ECF No. 91, at 24). They point to testimony from Mr. Tsai indicating that his regular routine in certifying Payment Applications for clients included "on site observations" and "walk[ing] around the site to see that the work has been done" and that he "signed [the certifications] believing that the numbers [that Winmar was claiming was due] were correct." (ECF No. 91-11, at 2-4). According to Defendants, calling Mr. Tsai as a witness only "would have cemented" Judge Kessler's opinion about the reliability of the certified Payment Applications. (ECF No. 91, at 25).

Plaintiff does not mention Defendants' failure to depose or call the Architect as a witness in the causation section of its opposition to the motion. The only piece of evidence it points to elsewhere in its papers that might refute Defendants' causation arguments is that Dennis Janson, the owner of the Architect, testified that "upon further investigation of those payments, actually going down to the job site, looking at it

again the issue came up that what they were asking for was not consistent with the state of the project." (ECF No. 99-27, at 10). As Defendants note, however, Mr. Janson later stated that the Payment Applications were incomplete, not necessarily incorrect, and that he had "no idea" whether documentation would have shown that certification was appropriate or not. (ECF Nos. 102, at 9; 91-25, at 13-14).

None of this testimony would have "rebutt[ed] the presumption of the certified Payment Applications' accuracy by presenting evidence that they were *prepared* incorrectly," as Judge Kessler said Plaintiff would have needed to do to change the outcome of the case. *Winmar*, 741 F.Supp.2d at 182 (emphasis added). Mr. Tsai's testimony would have supported the reliability of the certifications, and Mr. Janson's testimony would merely have restated the Architect's ambiguous assertion that the Payment Applications were not valid – something the Architect's rescissions had already expressed. Thus, no reasonable jury could find that the combined testimony from these two representatives of the Architect would have altered Judge Kessler's analysis of the case in Plaintiff's favor. Defendants' decisions not to depose the Architect and not to call the Architect as a witness, even if negligent, did not cause Plaintiff's losses. Defendants' motion for summary judgment will therefore be granted in part.

**B.   Defendants' Failure to Advise Plaintiff to Sue the Architect**

Defendants next argue that Plaintiff cannot survive summary judgment on its alternate theory that they should have advised it to sue the Architect.   Unlike Plaintiff's trial conduct theory of malpractice, a claim based on failure to advise Plaintiff to sue is not dependent on the outcome of the Winmar case.   Rather, to show malpractice for failure to advise it to sue, Plaintiff must demonstrate that it had a viable cause of action and that Defendants did not advise pursuing that cause of action.   *Macktal v. Garde*, 111 F.Supp.2d 18, 21 (D.D.C. 2000); *Niosi*, 69 A.2d at 60.   This requires the court to evaluate the viability of the unpursued claim, "the so-called 'case within the case[,]' to determine if it was a good cause of action."   *Macktal*, 111 F.Supp.2d at 21.   On Defendants' instant summary judgment motion, then, Plaintiff must show some evidence that it had a viable claim against the Architect.

**1.   The Case Within the Case**

"The elements of an action for professional negligence are the same as those of an ordinary negligence action. 'The plaintiff bears the burden of presenting evidence which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of.'" *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982) (quoting *Morrison v. MacaNamara*, 407 A.2d 555, 560 (D.C. 1979)).   In a

negligence action against the Architect, then, Plaintiff would have had to show: (1) that the Architect owed it a duty of care; (2) that the Architect breached that duty when it certified the Payment Applications; and (3) that the certification was the proximate cause of an injury or damages to Plaintiff.   The contractual relationship between the Architect and the Plaintiff clearly imposed a duty of care, but the parties dispute the other two elements of Plaintiff's putative claim.

> **a.   The Architect's Breach**

Plaintiff alleges that the Architect breached its duty of care by certifying the Payment Applications even though they did not accurately reflect the amount of work that had been completed.  (ECF No. 50 ¶ 18).  It has produced expert testimony from another architect who stated in his report that "Winmar in fact did not complete the work it claimed to have completed at the time that it issued the payment applications," and that the "Architect's certification of the payment applications under these circumstances breached the duty of care the Architect owed to [Plaintiff]]" (ECF No. 99-85, at 4).   Plaintiff's expert witness's testimony therefore meets Plaintiff's burden with regard to the breach element of a potential claim.

Defendants make two arguments that attack the viability of the underlying claim on the element of the Architect's breach of duty.   First, Defendants aver that Judge Kessler's opinion collaterally estops Plaintiff from disputing the validity of the

certifications.   Defendants   assert   that,   so   long   as   they   are   not   to   blame   for   Plaintiff's   failure   in   the   Winmar   litigation,   Plaintiff   is   "bound   by   the   factual   conclusion   made   by   Judge   Kessler   that   the   certified   Payment   Applications   were   reliable   and   the   best   evidence   of   the   amount   of   work   performed   by   Winmar."   (ECF   No.   91,   at   49).   Collateral   estoppel   bars   a   subsequent   court   from   revisiting   the   "determination   of   an   issue   of   fact   or   law   when   (1)   the   issue   is   actually   litigated   and   (2)   determined   by   a   valid,   final   judgment   on   the   merits;   (3)   after   a   full   and   fair   opportunity   for   litigation   by   the   parties   or   their   privies;   (4)   under   circumstances   where   the   determination   was   essential   to   the   judgment."   *Modiri v. 1342 Restaurant Group, Inc.*,   904   A.2d   391,   394   (D.C.   2006).

Defendants   acknowledge,   as   the   court   pointed   out   in   its   memorandum   opinion   on   Defendants'   motion   to   dismiss,   that   use   of   collateral   estoppel   would   be   unfair   if   "an   unfavorable   judicial   decision   allegedly   wrought   by   their   legal   malpractice   can   be   used   as   a   shield   against   a   legal   malpractice   claim."   (ECF   No.   15,   at   11).   Because   the   evidence   now   shows   that   their   trial   conduct   was   not   the   cause   of   the   unfavorable   decision   below,   however,   they   now   contend   that   the   court's   findings   that   certifications   were   reliable   means   that   Plaintiff   cannot   dispute   that   the   Architect   was   not   acting   negligently   when   it   made   them.   (ECF   No.   102,   at   24).

Although Judge Kessler's opinion refers to the certifications as "reliable and accurate evidence of the work completed," her analysis demonstrates that she was evaluating the certifications relative to the other evidence in front of her and in the absence of facts about the Architect's process. As this court found in its prior opinion, "Judge Kessler only *presumed* that the Architect's certifications were credible." (ECF No. 15, at 10).  She determined that the certified payment applications were the best evidence presented to that court but made no determination as to whether the certifications were made with reasonable care.  Nor was she in any position to do so without ever hearing from the Architect; as her opinion noted, she found it perplexing that neither party ever called the Architect as a witness.  *Winmar*, 741 F.Supp.2d at 182 n.17. Judge Kessler determined that the certifications were valid under the Contract despite the Architect's rescissions, with the caveat that Plaintiff "offered no evidence at trial showing how the Architect arrived at the decision to certify the Payment Applications." *See id.* at 182.  She specifically pointed out that Plaintiff might have rebutted the accuracy of the certifications "by presenting evidence that they were prepared incorrectly," but that it failed to do so.  *Id.*  Had Plaintiff filed a claim in the suit against the Architect, the parties might have presented evidence – like that of Plaintiff's expert witness here - rebutting Judge Kessler's assumption that "if

there was any bias in the Architect's decision to certify the Payment Applications, . . . it would have been in [Plaintiff's] favor." *Id.* at 181.   Judge Kessler's opinion thus does not preclude consideration of Plaintiff's evidence on the issue of "how the Architect arrived at the decision to certify."

Second, Defendants contend that finding the Architect to have breached its duty would be logically inconsistent with Judge Kessler's holdings that the certified Payment Applications were the best evidence.   This argument is simply a reformulation of Defendants' collateral estoppel argument.   Because the parties did not present Judge Kessler with any evidence as to the Architect's certification process, she accepted those certifications at face value.   Plaintiff's evidence is sufficient to create a dispute of fact over whether the Architect breached its duty of care.

**b.   Proximate Cause and The Architect's Rescissions**

As noted above, proximate cause is typically a question for the jury and should only be determined on summary judgment where "it is absolutely clear." *Smith v. Hope Village, Inc.*, 481 F.Supp.2d 172, 185 (D.D.C. 2007).   Plaintiff contends that the Architect's breach was the cause of two related, but distinguishable, injuries.   First, the Architect's certification established a debt that Plaintiff was obligated to pay to Winmar under the Contract.   According to Plaintiff, the work certified in the Payment Applications was not completed, and therefore the

Architect's negligent certification put them in the untenable position of paying Winmar money it had not earned or breaching its contract by not making payments that had been certified.[6] Plaintiff argues that its ensuing breach of contract caused the Winmar case, and, therefore, the Architect is liable for all costs connected to the litigation.  Then, the certification by the Architect was accepted by Judge Kessler as the best evidence in the Winmar litigation, which Plaintiff argues caused it a second harm, higher damages than it would have had to pay had the Payment Applications not been certified.  Plaintiff's expert testified that, but for the certifications, Winmar would have owed Plaintiff money – rather than vice versa - when Plaintiff terminated the Contract.  (ECF No. 99-85, at 4).  This evidence is sufficient to create a dispute of fact as to whether the Architect's breach was the proximate cause of its damages.

Defendants argue that any negligence by the Architect was not the proximate cause of Plaintiff's injuries because the Architect rescinded the certifications.  (ECF No. 91, at 43-44). Defendants maintain that "even if the certifications were improvidently issued in the first place, they could not have injured Plaintiff[]" because the rescissions would have undone any harm.  (*Id.*).  According to Defendants, Judge Kessler erred by holding that the rescissions were not authorized under the

---

[6] Plaintiff also alleges to have suffered an injury by making the single payment that it did make.

Contract, which they would have proven on appeal had Plaintiff not settled the suit. *See Winmar*, 741 F.Supp.2d at 182. If the appellate court had honored the rescisions, they aver, Plaintiff would not have suffered any injury.

Defendants have not shown that it is absolutely clear that the Architect did not cause harm to Plaintiff. First, even if Judge Kessler was wrong about the Contract and the rescisions, Plaintiff has argued that the certifications caused the Winmar litigation. Put another way, the litigation, and the costs accompanying it, were an injury caused by the Architect no matter its outcome – and, in turn, regardless of Judge Kessler's interpretation of the Contract. As Plaintiff points out, the rescisions came well after the three day window it had to make the payments or else be in breach of the Contract, a fact Defendants knew well. (*See* ECF No. 99, at 9-10). In short, rescission may have been an effort to "reduce a client's damages, [but does] not necessarily prove that the [] negligence did not injure the client." *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C. 1989).

Moreover, there is also a dispute of fact as to whether Judge Kessler erred in her interpretation of the Contract. Although Defendants are correct that the Claims process articulated in Section 4 of the Contract gives the Architect the power to demand "a response with supporting data from the other party" and to "approve the Claim" (ECF No. 91-6, at 20-21),

18

Defendants have not proven that the Architect was responding to a Claim under the Contract. The Architect rescinded its certification of the payments on January 5, 2006 (ECF No. 99-21), more than a month before Plaintiff sent its claim letter to the Architect on February 24. (ECF No. 91-13).[7] If the Architect rescinded outside of the claims process, it could only have done so, as Judge Kessler held, for one of the valid reasons for rescission of a previously issued certification articulated in Section 9.5.1. (*See* ECF No. 91-7, at 2-3).[8] It is also not clear whether a claim could be made after the

---

[7] Although Judge Kessler referred to this as a "formal claim," there may be some ambiguity even in the letter. *Winmar*, 741 F.Supp.2d at 177. The letter references Sections 4.3-4.4, the Claims sections, and Section 4.2.11 of the Contract, which gives the Architect power to "decide matters concerning performance under and requirements of the Contract." (91-6, at 19). Plaintiff had already terminated the Contract for convenience at the time of the letter, which would have triggered Section 14.4.3's requirement that Winmar was "entitled to receive payment for work executed," which, in turn, might have required the Architect's review under 4.2.11 as opposed to 4.3 or 4.4.

[8] In a footnote in their reply brief, Defendants also argue that the rescissions were valid under Section 9.5.1.4, which permits rescission because of "reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum." (ECF No. 102, at 22). In the rescission letter, the Architect made no reference to concerns about completing the project on budget, but Defendants argue that the Architect's reference to a $140,000 overcharge meant that "the Work clearly could not be completed 'for the unpaid balance.'" (*Id.*) They offer no evidence to support this contention other than a vague response from Plaintiff's expert that such a discrepancy was "*possibly* a basis for rescission" (ECF No. 102-2, at 144 (emphasis added)), and thus have not shown that there is no material dispute over whether the rescission was valid under the provisions of Section 9.5.1.

termination of the Contract.  (*See, e.g.*, ECF No. 91-6, at 19
(Section 4.3.3. requiring that the contractor proceed diligently
and the owner continue to make payments during the pendency of a
claim, which at least suggests that claims would be occurring as
part of an ongoing contract)).  If the rescissions were not
based on a claim, Judge Kessler's opinion not to consider them
valid under the Contract could have been correct.[9]  Given all of
these disputed facts, Defendants have not shown that they are
entitled to summary judgment in spite of Plaintiff's evidence of
a claim against the Architect.

### 2. Plaintiff's Instructions Not to Sue

Defendants next argue that, to the degree that Plaintiff
had a case against the Architect, it specifically directed them
not to sue.  They contend that, although it was obvious that
Plaintiff had a potential cause of action against the Architect,
Plaintiff told them not to sue the Architect, presumably because
of their ongoing working relationship – Plaintiff and the
Architect were working on numerous projects together worldwide

---

[9] It is also unclear that the certification would not have
done harm, even if Judge Kessler had accepted the rescissions.
Judge Kessler may have simply found the rescissions less
persuasive than the certifications as to the value of the work
done.  Judge Kessler's opinion was based on two separate
theories of damages, one for breach of contract and one for
restitution for work done.  In an effort to determine how much
work was actually done, then, she might have considered the
certifications as evidence even if they had not been
contractually binding, and, in turn, might have given the
precise numeric information in the certifications more weight
than the rescissions, which were based only on vague
"discrepancies" and missing documentation.

at the time. (ECF No. 91, at 41). They point to a declaration from Gary Napier, the primary on-site coordinator for Plaintiff, who specifically stated that Plaintiff made the decision not to sue the Architect and communicated that decision to Defendants. (*Id.*).

Plaintiff disputes the veracity of this instruction, pointing out that Mr. Napier's declaration does not identify who exactly gave this instruction to whom, and whether that individual had authority to do so. (ECF No. 99, at 31-32). Moreover, it argues that Defendants appear to be relying on conversations that do not account for the changes in the Winmar dispute. It points to testimony from Mr. Napier stating that the decision he referred to was made at a meeting in June 2006. (*See, e.g.*, ECF No. 99-9, at 14). In June 2006, before QNB had initiated the Winmar litigation, Plaintiff and Defendants had agreed not to sue the Architect, or Winmar for that matter, because they believed the amount at stake was only about $80,000, which was owed to them, and the cost to pursue it might have been "lost in legal fees." (ECF Nos. 99, at 27; 99-9 at 13). When Winmar's third party claim against Plaintiff occurred in November 2006, Plaintiff went from potentially being owed $80,000, to potentially owing more than $1.7 million. Plaintiff argues that Defendants had a duty to reevaluate Plaintiff's options and their legal advice at that time. (ECF Nos. 99, at 27). Defendants attempt to rebut this notion by pointing to a

treatise on legal malpractice, which states that the extent of a duty "derives from the circumstances, being the subject matter of the retention and the parties' agreement." 1 Ronald E. Mallen & Allision M. Rhodes, Legal Malpractice, § 8:5 (2016). But as Plaintiff points out, the subject matter of the retention changed when they went from potential plaintiffs in a suit against Winmar to defendants in a litigation with much larger consequences. Defendants' obligation was not to "continually re-assess whether a claim should be brought against the Architect" (ECF No. 102, at 18), but when Plaintiff was sued and it hired Defendants to defend it against the Winmar suit, they had a duty to advise Plaintiff on how to mitigate its losses under the circumstances. A reasonable jury could find that this duty would include an obligation to advise Plaintiff that a suit against the Architect was in its best interest.

Defendants make a last ditch effort to argue that they did advise Plaintiff to sue by pointing to a statement made to the mediator in the Winmar litigation in which they noted that "the Architect failed to perform many of its obligations under the Contract, . . . [but] no action or claim ha[d] been asserted against the Architect in connection with the Contract," which they say called to Plaintiff's attention the fact that claims against the Architect had not been asserted. (ECF No. 91-30, at 6). The question is not whether Plaintiff was aware that it might have had a claim against the Architect, but rather whether

Defendants advised Plaintiff to pursue such a claim or discussed the possibility with them in the way that a reasonable attorney would.  Ambiguous statements made in attachments that are addressed to third parties are insufficient to show that Defendants are entitled to summary judgment.[10]

### 3.  Statute of Limitations

Finally, Defendants assert that even if Plaintiff had a valid claim against the Architect, their failure to advise Plaintiff to sue was not the cause of its failure to sue because Plaintiff hired new counsel within the statute of limitations period of its claims against the Architect.  Defendants contend that the three-year statute of limitations had not run when new counsel began representing Plaintiff in July 2012.  (ECF No. 91, at 56).  They base this argument on the premise that Plaintiff "suffered no injury from the Architect's alleged certification errors, and thus no legal harm occurred, until Judge Kessler chose, in preference to all of the other evidence offered at trial, to rely upon the Architect's rescinded certifications as proof of the amount of work that Winmar had completed prior to the termination for convenience." (*Id.* at 55).  According to

---

[10]  Defendants further point to the statement submitted by Winmar to the mediator, which stated that "if [Plaintiff] had a problem with their Architect, it would seem as though they might need to be a party to this action or, at least seek some sort of redress against the Architect." (ECF No. 91-31, at 8). Although this type of statement seems closer to actual advice than Defendants' own statement, it was made by Winmar, an opposing party, to the mediator, and thus has no bearing on what Defendants advised Plaintiff to do in this matter.

Defendants, then, the limitations period did not begin to run until, "at the earliest, those findings of fact were made on September 29, 2010, or, at the latest, upon issuance of final judgment on March 13, 2012." (*Id.* at 56). Defendants cite to *Wagner v. Sellinger*, 847 A.2d 1151 (D.C. 2004), to support their contention that a claim does not accrue in a malpractice suit until the plaintiff had suffered actual injury by losing the underlying suit. There, the District of Columbia Court of Appeals stated:

> If that potential is not realized until later — if its occurrence depends on "a contingent or future event" — then the injury is not sustained until the contingent or future event occurs. . . . That is to say, until the lawsuit is resolved (either by verdict or ruling in court or by settlement), the injury remains uncertain or inchoate.

*Id.* at 1156. In *Wagner*, the defendant lawyers represented the plaintiff in a medical malpractice suit, but were fired during the suit. *Id.* at 1153. The defendants' discovery efforts had apparently been woefully inadequate, but the court held that "[n]o injury allocable to Sellinger's apparent negligence could be ascertained unless and until the Wagners — using competent counsel to resurrect their medical malpractice claim — failed nonetheless to recover damages from the medical defendants." *Id.* at 1153, 1156.

*Wagner* dictates that Plaintiff here could not have brought a claim *against Defendants* until their errors caused injury,

which, indeed, depended on the outcome of the case. It does not, however, suggest that Plaintiff could not have brought a potential negligence suit *against the Architect*. The claim against the lawyer in *Wagner* came to fruition during the underlying litigation; as the court said, "Typically, therefore, a potential — not actual — injury has occurred when a client claims that an attorney has mishandled a lawsuit *still in progress* by failing to take appropriate discovery or by making some other error that, however egregious, does not conclude the lawsuit." *Id.* at 1156 (emphasis added). Here, the Architect's negligence occurred prior to the lawsuit, and allegedly, was the cause of Winmar's suit against Plaintiff. This case is therefore much more like the ones "when an attorney negligently drafts a document . . . that fails to protect the client's interests," under which, the *Wagner* court stated, an injury is realized at the time of the error. *Id.* at 1157 n.9.

In cases where the negligence is the alleged cause of the underlying suit, the District of Columbia courts have clearly stated that the "attorney's fees and costs expended as a result of [the negligent act] constitute legally cognizable damages for purposes of stating a claim." *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C. 1989). As the *Knight* court clarified, where litigation ensues because of a third party's negligent act, an injury has occurred, even if the litigation is "ultimately successful for the client, [if it] could have been avoided by

adherence to a proper standard of care." *Id.* Thus, while success in the litigation "undoubtedly will reduce a client's damages, it will not necessarily prove that the [] negligence did not injure the client." *Id.* For the sake of the statute of limitations, then, Plaintiff would have suffered an alleged injury due to the Architect's negligent certifications when it began to incur legal fees as a result of Winmar's third-party claim against it, which was filed on November 9, 2006. That claim was time-barred by Novemeber of 2009, well before new counsel took over, and Defendants cannot justify summary judgment in their favor based on the appointment of new counsel in 2012.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendants will be granted in part and denied in part. A separate order will follow.


_____
/s/
DEBORAH K. CHASANOW
United States District Judge